# SUMMONS ISSUED

LASASSO GRIESMEYER LAW GROUP PLLC
Attorneys for Plaintiff
Office and Post Office Address
80 Maiden Lane, Suite 2205
New York, New York 10038
(212) 421-6000



FILED
CLERK

2011 JUN -6  PM 12:50

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CV11 - 2709**

------------------------------------------------------------

MICHAEL CHARLES,

                                    Plaintiff,                    VERIFIED COMPLAINT

                    -against-

COUNTY OF NASSAU; NASSAU COUNTY POLICE
COMMISSIONER LAWRENCE W. MULVEY; NASSAU
COUNTY POLICE CHIEF OF DETECTIVES STEVEN
SKRYNECKI, in his official and individual capacities;
NASSAU COUNTY POLICE DETECTIVE LIEUTENANT
KEVIN SMITH, in his individual and official capacities;
NASSAU COUNTY POLICE DETECTIVE RENE YAO in       Jury Trial Demanded
her official and individual capacities; NASSAU COUNTY                    SPATT, J.
POLICE DETECTIVE CHARLES DECARO, in his official
and individual capacities; NASSAU COUNTY POLICE
DETECTIVE SERGEANT RICHARD DORSI, in his official
and individual capacities; INCORPORATED VILLAGE OF
HEMPSTEAD; VILLAGE OF HEMPSTEAD TRUSTEE
PERRY PETTUS, in his official and individual capacities;
VILLAGE OF HEMPSTEAD POLICE CHIEF JOSEPH       BOYLE, M.J.
WING, in his official and individual capacities; KENNETH
POWELL and JOHN DOES # 1-5,

                                    Defendants.
------------------------------------------------------------X

        Plaintiff Michael Charles, by his attorneys LaSasso Griesmeyer Law Group

PLLC, complaining of defendants alleges:

1

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. 1331 and 26 U.S.C. 1331

(3) and (4) due to Defendant's violations of Section 42 U.S.C. 1983 as well as various provisions

of the United States Constitution.

2.      Venue is proper in this district under 28 U.S.C. Section 1391, based on the

fact that Plaintiff's residence and the place where the unlawful acts complained of herein

occurred.

3.      The Court is requested to invoke pendent jurisdiction under 28 U.S.C.

1367(a) with respect to Plaintiff's claims arising under New York State law.

4.      Each and all of the acts of the Defendants herein were done by the

Defendants, their servants, agents and/or employees under the color and pretense of the statutes,

ordinances, regulations, customs and usages of the State of New York and the County of Nassau,

and under the authority of their offices as officers of the County of Nassau and State of New

York.

5.      That on or about June 3, 2010, and within the 90 days after the cause of

action herein arose and more than 30 days prior to the commencement of the action, Plaintiff

duly presented, served and filed a Notice of Claim with Defendants pursuant to New York

General Municipal Law ("GML") § 50-i, and this action was commenced within one year and 90

days after said cause of action herein accrued.

6.      Prior to the commencement of this action, Plaintiff has duly complied with

all the conditions precedent for the bringing of this action and Plaintiff has complied with the

provisions and statutes in such cases made and provided, in particular, on or about June 3, 2010,

and within 90 days after the cause of action herein accrued and more than 30 days prior to the

2

commencement of this action, Plaintiff duly presented, served and filed a Notice of Claim herein with the Defendants, pursuant to GML § 50-i, for an adjustment of damages sustained by Plaintiff herein upon which this cause of action is based; and thereafter the Defendants for a period of more than 30 days before the commencement of this action neglected and refused to make an adjustment for payment on said claim, said claim remains unadjusted and unpaid although Plaintiff has duly demanded that same be paid and adjusted.

7.      That, on July 29, 2010, Defendants Incorporated Village of Hempstead, Perry Pettus and Joseph Wing, by their attorney, conducted an examination of Plaintiff pursuant to GML § 50-h.

8.      That the remaining Defendants have refused or neglected to schedule and/or notice a GML § 50-h hearing within 90 days and, therefore, these Defendants have waived their right to hold such a hearing.

**PARTIES**

9.      Plaintiff, MICHAEL CHARLES (hereinafter "CHARLES") is an 18 and 1/2 year veteran of the New York City Police Department; is a 52 year old citizen of the United States and resident of the County of Nassau, State of New York; is the owner, operator and/or employee of private investigation and security companies; and is the former Chief of the Hempstead Village Volunteer Fire Department (hereinafter "HVVFD").

10.     At all times hereinafter mentioned, COUNTY OF NASSAU (hereinafter ("COUNTY") was/is a municipal body of the State of New York, with the offices of its County Attorney located at One West Street, Mineola, New York 11501.  Said municipality exists and operates under and by virtue of the laws of the State of New York.

3

11.     At all times hereinafter mentioned, LAWRENCE W. MULVEY (hereinafter "MULVEY") was the Commissioner of the Nassau County Police Department with an office located at 1490 Franklin Avenue, Mineola, New York 11501.

12.     At all times hereinafter mentioned, STEVEN SKRYNECKI (hereinafter "SKRYNECKI") was/is the Chief of Detectives of the Nassau County Police Department with an office located at 1490 Franklin Avenue, Mineola, New York 11501.

13.     At all times hereinafter mentioned, KEVIN SMITH (hereinafter "SMITH") was/is a Detective Lieutenant with the Nassau County Police Department with an office located at 1490 Franklin Avenue, Mineola, New York, 11501.

14.     At all times hereinafter mentioned, RENE YAO (hereinafter "YAO") was/is a Detective assigned to the Third Squad of the Nassau County Police Department, located at 214 Hillside Avenue, Williston Park, New York 11596.

15.     At all times hereinafter mentioned, CHARLES DECARO (hereinafter "DECARO") was/is a Detective assigned to the Third Squad of the Nassau County Police Department, located at 214 Hillside Avenue, Williston Park, New York 11596.

16.     At all times hereinafter mentioned, RICHARD DORSI (hereinafter "DORSI") was/is a Detective Sergeant assigned to the Third Squad of the Nassau County Police Department, located at 214 Hillside Avenue, Williston Park, New York 11596.

17.     At all times hereinafter mentioned, THE INCORPORATED VILLAGE OF HEMPSTEAD (hereinafter "VILLAGE") was/is a municipal corporation created under the laws of the State of New York, and located in the County of Nassau at 99 Nichols Court, Hempstead, New York 11550.

4

18.     At all times hereinafter mentioned, PERRY PETTUS (hereinafter "PETTUS") was/is a Trustee for the VILLAGE with an office located at 99 Nichols Court, Hempstead, New York, 11550.

19.     At all times hereinafter mentioned, JOSEPH WING (hereinafter "WING") was/is the Police Chief for the VILLAGE with an office located at 99 Nichols Court, Hempstead, New York, 11550.

20.     At all times hereinafter mentioned, KENNETH POWELL (hereinafter "POWELL") was/is the stepson of PETTUS.

21.     At all times hereinafter mentioned, the COUNTY operated the Nassau County Police Department (hereinafter "NCPD"), a police department as part of and in conjunction with its municipal function.

22.     At all times hereinafter mentioned, the COUNTY maintained, managed and controlled the NCPD.

23.     At all times hereinafter mentioned, the COUNTY, its servants, agents and/or employees employed police officers, and other personnel, to work as representatives of the COUNTY.

24.     At all times hereinafter mentioned, the COUNTY employed police officers, known herein as MULVEY, SKRYNECKI, SMITH, YAO, DECARO and DORSI, to work as representatives of the COUNTY.

25.     At all times hereinafter mentioned, the COUNTY had the duty to ensure that the actions, activities and behavior of its said servants, agents, police offices, detectives and/or employees conform to a certain standard of conduct established by law for the protection of others against unreasonable risk of harm.

5

26.     At all times hereinafter mentioned, the COUNTY had the duty to ensure that its said servants, agents, police officers, detectives and/or employees conduct themselves in such a manner so as not to intentionally, wantonly and/or negligently result in injuries to others, including CHARLES.

27.     At all times hereinafter mentioned, MULVEY, SKRYNECKI, SMITH, YAO, DECARO and DORSI and JOHN DOES # 1-5, said names being fictitious and presently unknown, were police officers, servants, agents, employees and/or representatives of the COUNTY.

28.     At all times hereinafter mentioned, MULVEY, SKRYNECKI and SMITH supervised and controlled Nassau County police officers, including YAO, DECARO AND DORSI.

29.     At all times hereinafter mentioned, MULVEY, as NCPD Commissioner employed police officers, known herein as SKRYNECKI, SMITH, YAO, DECARO and DORSI, to work as representatives of the COUNTY and NCPD.

30.     At all times hereinafter mentioned, the MULVEY, SKRYNECKI, and SMITH had the duty to ensure that the actions, activities and behavior of its said servants, agents, police offices, detectives and/or employees conform to a certain standard of conduct established by law for the protection of others against unreasonable risk of harm.

31.     At all times hereinafter mentioned, MULVEY, SKRYNECKI and SMITH had a duty to ensure that its said servants, agents, police officers, detectives and/or employees conduct themselves in such a manner so as not to intentionally, wantonly and/or negligently result in injuries to others, including CHARLES.

6

32.     At all times hereinafter mentioned, the VILLAGE operated the Hempstead Village Police Department (hereinafter "HVPD"), a police department as part of and in conjunction with its municipal function.

33.     At all times hereinafter mentioned, the VILLAGE maintained, managed and controlled the HVPD and its Police Chief, WING.

34.     At all times hereinafter mentioned, the VILLAGE, its servants, agents and/or employees employed police officers, trustees and other personnel, to work as representatives of the VILLAGE.

35.     At all times hereinafter mentioned, the VILLAGE employed police officers, known herein as WING, to work as representatives of the VILLAGE.

36.     At all times hereinafter mentioned, the VILLAGE employed trustees, known herein as PETTUS, to work as representatives of the VILLAGE.

37.     At all times hereinafter mentioned, the VILLAGE had the duty to ensure that the actions, activities and behavior of its said servants, agents, police offices, detectives, trustees and/or employees conform to a certain standard of conduct established by law for the protection of others against unreasonable risk of harm.

38.     At all times hereinafter mentioned, the VILLAGE had the duty to ensure that its said servants, agents, police officers, detectives, trustees and/or employees conduct themselves in such a manner so as not to intentionally, wantonly and/or negligently result in injuries to others, including CHARLES.

## FACTUAL ALLEGATIONS

39.     As Chief of the HVVFD, CHARLES was required to attend fire calls; ensure member safety during alarms and ensure that the members were using their equipment properly.

40.     As Chief of the HVVFD, CHARLES was provided with a Chief's vehicle – a red Chevrolet Tahoe with "CHIEF" written along the side of the vehicle.

41.     Inside the Chief's vehicle is safety equipment, including first aid and paramedic kits.

42.     On March 7, 2010, at approximately 2:00 P.M., in conjunction with his duties as Chief of the HVVFD, CHARLES was travelling in his Chief's vehicle to the HVVFD Southside firehouse to participate in, and supervise, a multi-unit drill with the HVVFD and the Rockville Center Fire Department.

43.     The HVVFD firehouse is located at the intersections of Bernhard Street and Long Beach Boulevard, Hempstead, New York.

44.     As CHARLES approached the firehouse, he noticed two groups of young men, standing across the street from each other, with each group wearing distinct colors. The members of one group were dressed in black and other dark clothing; the members of the other group were in red.

45.     From his experience as a police officer, CHARLES knew that these groups represented rival gangs.

46.     While at the firehouse, CHARLES heard gunshots coming from the street.

47.     Shortly after the shots rang out, it was reported via police scanner and HVVFD pagers that shots were fired at 29 Peters Avenue, which is in close proximity to the HVVFD firehouse – and where the rival gangs had congregated.

48.     Because of the close proximity of the shootings to the firehouse, CHARLES believed that the call for an Emergency Medical Technician would be directed to the HVVFD firehouse.

49.     The HVVFD ambulance was not at the firehouse at this time.

50.     As a preemptive measure, and aware that there were medical supplies in the Chief's vehicle, CHARLES asked an EMT to accompany him to the scene of the shooting in order to determine if anyone required medical attention.

51.     Upon arriving at the scene, CHARLES saw Sergeant Johnson of the Hempstead Village Police Department at the scene across the street from 29 Peters.

52.     After speaking with Sgt. Johnson, CHARLES learned that a bullet had gone through the back seat of a car parked in that driveway and grazed the arm of a 30-year-old woman who was sitting in the car at the time with her infant.

53.     Sgt. Johnson told CHARLES that the woman shot was stable, pointed west down Peters and stated, in sum and substance, that they went that way.

54.     CHARLES, believing Sgt. Johnson had asked for assistance in locating a suspect, left the scene in the direction that Sgt. Johnson pointed, made a left on South Franklin Avenue and then made the next immediate left turn onto Sterling Place.

55.     While on Sterling Place CHARLES encountered several individuals, whom he asked whether they saw anyone running through backyards of the houses. These individuals stated that they did not.

9

56.     CHARLES then headed back towards South Franklin Avenue when he heard a call over the scanner stating that an African-American male, dressed in black, was seen jumping a fence into Lincoln Park.

57.     CHARLES was familiar with Lincoln Park through his coaching of youth lacrosse leagues.

58.     CHARLES drove to Lincoln Park and proceeded to drive slowly through the park.

59.     While in Lincoln Park, CHARLES encountered an African-American man, who informed CHARLES that an African-American male wearing black clothing went down East Graham Avenue.

60.     CHARLES then headed out of Lincoln Park onto East Graham and proceeded east on East Graham.   Charles then crossed over Baldwin Road and reached Tompkins Place.

61.     While on Tompkins Place, CHARLES spotted the individual matching the description given over the scanner and by the gentleman in Lincoln Park.

62.     CHARLES observed this individual walking on the driver's side of his vehicle while carrying a bottle of malt liquor or beer in his right hand and a marijuana cigar in his left hand.

63.     CHARLES proceeded to drive past the individual, stop the vehicle, and then exit the vehicle and approach the individual.

64.     CHARLES identified himself to the individual as the fire chief of HVVFD.

10

65. CHARLES asked the individual a few questions, including where he was coming from and if he knew anything about the shooting on Peters Avenue.

66. The individual identified himself as POWELL, PETTUS's stepson.

67. Prior to March 7, 2010, CHARLES had never seen, met or interacted with POWELL before.

68. CHARLES informed POWELL that he knew his stepfather and that CHARLES would be calling PETTUS about the incident.

69. CHARLES returned to his vehicle and left PETTUS on Tompkins Place.

70. At no time did CHARLES possess a firearm during his interaction with POWELL.

71. At no time during his interaction with POWELL did CHARLES harm, threaten or menace POWELL.

72. After leaving Tompkins Place, CHARLES returned to the HVVFD Southside firehouse.

73. Soon after the incident, CHARLES contacted the gang unit of the HVPD and informed them of the incident.

74. POWELL was and is a known member of the Crip gang.

75. On March 8, 2010, at approximately 8:30 P.M., YAO drove to CHARLES's residence.

76. YAO questioned CHARLES about his interaction with POWELL on March 7th.

77. YAO informed CHARLES that POWELL was making an issue of the incident.

11

78.     CHARLES asked if POWELL's complaint was politically motivated. YAO responded, "no."

79.     After their conversation, YAO left CHARLES's residence.

80.     Approximately 2 hours later, YAO contacted CHARLES and asked him to come down to the Third Squad.

81.     CHARLES asked if there was a problem and YAO responded that CHARLES might be getting arrested for the incident with POWELL.

82.     CHARLES arrived at the Third Squad at approximately 11 P.M. on March 8, 2010.

83.     When CHARLES entered the squad he was met by YAO and placed in an interrogation room.

84.     Shortly thereafter, DORSI entered the room and began badgering CHARLES about the firearms that he owned.

85.     CHARLES answered DORSI's questions and informed DORSI that he owned "four or five" handguns.

86.     DORSI immediately began accusing CHARLES of lying even though CHARLES's pistol permit corroborated his statement to DORSI about gun ownership.

87.     DORSI continued to badger CHARLES about ownership of shotguns.

88.     CHARLES informed DORSI that he did not own any shotguns.

89.     After approximately thirty to forty minutes, DORSI abruptly left while YAO stayed in the room with CHARLES.

90.     CHARLES asked YAO, "I thought you said this wasn't political," to which YAO replied, "It is political."

12

91.    YAO then informed CHARLES that the NCPD was going to formally arrest him.

92.    The NCPD arrested CHARLES at approximately 12:30 A.M. on March 9, 2010.

93.    At no time was CHARLES read his Miranda rights.

94.    CHARLES was charged with menacing in the second degree, possession of a dangerous weapon in the fourth degree and false imprisonment, three misdemeanors.

95.    DORSI wrongfully and maliciously attempted to process CHARLES through NCPD Central Booking, which, upon information and belief, would have required CHARLES to be detained in jail until he was arraigned.

96.    DORSI's attempt was rejected by the uniformed desk Lieutenant of the Third Squad.

97.    CHARLES received a desk appearance ticket ("DAT") and was released from police custody at approximately 4 A.M.

98.    On or about March 9, 2010, SKRYNECKI held a press conference at NCPD headquarters detailing the arrest of CHARLES.

99.    Upon information and belief, it is atypical for a high ranking police official such as SKYNECKI to hold a press conference about a misdemeanor complaint.

100.    Upon information and belief, in the 24+ hour period between when CHARLES left POWELL and when YAO first approached CHARLES, POWELL spoke with PETTUS about the incident.

13

101.    Upon information and belief, during this 24+ hour period, PETTUS contacted WING and orchestrated a plan to use the incident with POWELL to affect the arrest of CHARLES.

102.    Upon information and belief, prior to March 7, 2010, both PETTUS and WING harbored animosity towards CHARLES.

103.    Upon information and belief PETTUS and WING utilized their political influence to manipulate the arrest of CHARLES.

104.    Upon information and belief, PETTUS and WING had a vendetta against CHARLES because they viewed him as a threat to their jobs.

105.    Based on his prior police experience and knowledge of law enforcement, CHARLES had been sought out to assist and consult on several matters regarding the HVPD.

106.    During one project CHARLES assisted with on behalf of the VILLAGE, it was discovered that PETTUS, the trustee with the responsibility of overseeing the HVPD, was abusing his privileges and misusing HVPD resources.

107.    As a result of CHARLES's discovery and reports, PETTUS was removed from his position over overseeing the HVPD.

108.    Additionally, several representatives and residents of the VILLAGE vocalized their desire to have CHARLES serve as police chief of the HVPD.

109.    Further, CHARLES was often asked to participate in projects relating to the HVPD by WING's superiors and without WING's involvement, consent and/or knowledge.

110.    Upon information and belief, these incidents motivated both PETTUS and WING to attempt to have CHARLES discredited, dishonored and imprisoned.

111.    PETTUS and WING conspired with POWELL to offer false testimony and statements regarding the March 7, 2010 conversation with CHARLES.

112.    Further, PETTUS and WING conspired with COUNTY police officers, including SKRYNECKI, SMITH, YAO, DECARO and DORSI to improperly affect the arrest of CHARLES based upon false testimony and information.

113.    Subsequent to CHARLES's arrest, PETTUS and WING undertook a smear campaign in an attempt to have CHARLES ostracized in the local community.

114.    Specifically, PETTUS and WING spread vicious rumors throughout the VILLAGE that CHARLES, a Caucasian, was a racist.

115.    PETTUS made statements that he would bring this incident to the attention of the Reverend Al Sharpton in an attempt to coerce the Reverend into speaking out against CHARLES publically.

116.    Additionally, PETTUS and WING spread false information throughout the village that CHARLES was an armed vigilante who targeted African-Americans.

117.    Upon information and belief, the investigation and arrest of CHARLES, if necessary, should have been conducted by the HVPD.

118.    Instead of allowing the HVPD to handle the investigation of POWELL's complaints, WING and PETTUS utilized political influence connections and favors to improperly transfer matter to the NCPD and have the NCPD wrongfully arrest and charge CHARLES without performing a thorough and independent investigation.

119.    Ultimately, on March 15 and 16 2011, CHARLES was vindicated from all charges stemming from the March 7, 2010 incident.

15

## AS AND FOR A FIRST CAUSE OF ACTION
### 42 U.S.C § 1983 – FALSE ARREST

120.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 119, inclusive, as if fully set forth herein.

121.    As described above, the VILLAGE Defendants, along with POWELL, fabricated menacing, weapons possession and false imprisonment charges against CHARLES, and used this information to improperly urge the COUNTY and its employees into arresting and arraigning CHARLES.

122.    These actions demonstrate that the VILLAGE, PETTUS, WING and POWELL played an active role in the arrest and prosecution of CHARLES, gave advice and encouragement to the NCPD, procured the arrest of CHARLES to be made, and through these actions showed active, officious and undue zeal.

123.    Had the COUNTY and/or VILLAGE performed a proper, thorough and objective investigation, the COUNTY Defendants would have determined that CHARLES had not committed any crime.

124.    The impetus for the arrest and arraignment of CHARLES were the false statements made by POWELL, the malicious motives of PETTUS and WING and the illegal and improper investigation into CHARLES by the COUNTY Defendants.

125.    The VILLAGE, PETTUS, WING and POWELL pushed this improper arrest in order to defame, discredit and punish CHARLES.

126.    Had the VILLAGE and/or WING conducted a proper, thorough and objective investigation it would (i) have determined that the evidence did not support a menacing, weapons possession or false imprisonment charge and (ii) not have turned the case over the to the NCPD.

16

127. Had the COUNTY Defendants conducted a proper, thorough and objective investigation it would have determined that the evidence did not support a menacing, weapons possession or false imprisonment charge.

128. Had the COUNTY Defendants conducted a proper, thorough and objective investigation it would learned that CHARLES was being improperly and unjustly targeted by members of the VILLAGE, including PETTUS and WING.

129. PETTUS and WING, vindictively spearheaded this improper investigation and arrest of CHARLES in order to eliminate CHARLES who they believed was a threat to their jobs.

130. The investigations of CHARLES conducted by the COUNTY Defendants were performed with gross misconduct, bad faith and with no objectivity whatsoever.

131. All Defendants abused their power, their positions within the COUNTY and the VILLAGE, and the policies and procedures of the COUNTY and VILLAGE to further their improper and illegal investigation and arrest of CHARLES.

132. This misconduct was magnified by the COUNTY Defendants' neglect to: (a) properly investigate the matter; (b) focus on the totality of the evidence; (c) perform a thorough and objective investigation; (d) properly supervise the investigating officers; and (e) have proper policies and safeguards in place to prevent such gross misuse of power and authority.

133. The COUNTY Defendants investigated POWELL's complaint against CHARLES.

17

134.    During the period of time between the initial interview of POWELL and the arrest of CHARLES, the COUNTY Defendants learned and acquired notice that no crime had been committed by CHARLES.

135.    Defendants YAO, DECARO and DORSI did not have probable cause nor reasonable belief that probable cause existed to arrest Plaintiff and seize Plaintiff's person.

136.    Without probable cause or any legal right, Defendants YAO, DECARO and DORSI, while acting within the scope of their authority, intentionally, wrongfully, unlawfully and maliciously held CHARLES against his will while he was aware of the confinement for approximately 5 hours.

137.    Defendants YAO, DECAO and DORSI, in arresting and detaining CHARLES without probable cause, or reasonable belief that probable cause existed, abused their power and authority as employees of the County of Nassau and under color of state and/or local law.

138.    Upon information and belief, it was the deliberate choice, policy and custom of Defendants COUNTY, MULVEY, SKRYNECKI and SMITH to fail to adequately supervise and train their police officers, including YAO, DECARO and DORSI, in a manner to discourage unlawful arrests, causing YAO, DECARO and DORSI to arrest CHARLES without probable cause or a reasonable belief that probable cause existed.

139.    As a result of the above-described deliberate choices, policies and customs, police officers employed by Defendant COUNTY, including YAO, DECARO and DORSI, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

140.    The above-described deliberate choices, policies and customs demonstrated a deliberate indifference on the part of the policy makers of Defendant COUNTY to the constitutional rights of persons residing and doing business within the COUNTY, and were the cause of violations of CHARLES's rights alleged herein.

141.    By reason of their acts and omissions, Defendants YAO, DECARO and DORSI, acting under color of state law and within the scope of their authority, in gross and wanton disregard of CHARLES's rights, subjected CHARLES to an unreasonable seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

142.    As a result of the Defendants conduct, CHARLES has suffered deprivation of liberty and privacy, has been adversely affected in employment, business and in ordinary life's pursuits and, in addition, suffered emotional distress and was caused, permitted and allowed to fear for his safety, suffer humiliation, embarrassment, anxiety and ridicule. CHARLES has suffered all the disabling mental and emotional symptoms of such injuries, all of which may be permanent and have caused diminution in the quality of CHARLES's life.

143.    In addition, the acts of Defendants were so egregious and reprehensible and were performed in a manner which violated the law and which were so outrageous that it constitutes conduct that no civilized society should be required to tolerate and, in addition to all damages suffered by CHARLES and in addition to all of the measures of relief to which CHARLES may properly be entitled to herein, Defendants should also be required to pay punitive damages to punish them for their reprehensible conduct and to deter them from such conduct in the future, and as an example to others similarly situated.

144.    Plaintiff therefore, pursuant to 42 U.S.C. § 1983, seeks compensatory damages in this cause of action for pain and suffering for the emotional harm inflicted upon

19

CHARLES in the sum of Five Million Dollars, including punitive damages, as well as attorney's fees and all other damages available under the statue upon which this action is predicated.

## AS AND FOR A SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – FIRST AMENDMENT

145.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 144, inclusive, as if fully set forth herein.

146.    As set forth in detail by the above allegations, Defendants PETTUS and WING, acting collectively and individually, have engaged in actions and abuses and retaliatory conduct against CHARLES's speech of public concern.

147.    Defendants PETTUS and WING committed the aforesaid unlawful acts and abuses while acting under color of law, and through the abuse of the authority and power of their individual positions within VILLAGE government.

148.    Defendant PETTUS and WING's retaliation against CHARLES after he spoke out publicly to the VILLAGE Mayor and VILLAGE Trustees on matters concerning inefficiencies within the VILLAGE and HVPD and official misconduct and abuses by VILLAGE employees, including PETTUS and WING, was and is intended to place a chilling effect upon the exercise of CHARLES's First Amendment right to express speech regarding matters of public concern (i.e. systemic misuse of VILLAGE resources and taxpayer funds; and official misconduct by PETTUS and WING). Defendants PETTUS and WING's retaliatory conduct, acts of intimidation and defamation of CHARLES after he spoke out on matters of public concern, constituted punishment for expressing protected speech, thus further violating CHARLES's First Amendment rights.

149.    As a direct result of said acts, CHARLES has suffered and continues to suffer loss of income, loss of other employment benefits, loss of career opportunities, and has

suffered and continues to suffer repeated, severe and permanent psychological, emotional and physical trauma and damage, including distress, humiliation, embarrassment, great financial expense and damage to his personal and professional reputations, and the emotional and psychological trauma as alleged in the complaint.

150.    Defendants PETTUS and WING's acts have caused CHARLES to suffer and has resulted in diminishing his employment and the value of his businesses.

151.    In addition, the acts of Defendants PETTUS and WING were so egregious and reprehensible and were performed in a manner which violated the law and which were so outrageous that it constitutes conduct that no civilized society should be required to tolerate and, in addition to all damages suffered by CHARLES and in addition to all of the measures of relief to which CHARLES may properly be entitled to herein, Defendants should also be required to pay punitive damages to punish them for their reprehensible conduct and to deter them from such conduct in the future, and as an example to others similarly situated.

152.    Plaintiff therefore, pursuant to 42 U.S.C. § 1983, seeks compensatory damages in this cause of action for pain and suffering for the emotional harm inflicted upon CHARLES in the sum of Five Million Dollars, including punitive damages, as well as attorney's fees and all other damages available under the statue upon which this action is predicated

### AS AND FOR A THIRD CAUSE OF ACTION
### 42 U.S.C § 1983 – MUNICIPAL VIOLATIONS

153.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 152, inclusive, as if fully set forth herein.

154.    At all times material to this Complaint, Defendants COUNTY and VILLAGE had in effect *de facto* policies, practices, customs and usages that condoned and

fostered the unconstitutional conduct of the individual Defendants, and were a direct and proximate cause of the violations, damages and injuries complained of herein.

155.   Defendants COUNTY and VILLAGE, acting under color of law, and through their employees, servants, agents and designees, have engaged in a course of action and behavior for decades, rising to the level of a policy, custom and systemic condoned practice, which has deprived CHARLES and other individuals similarly situated of rights, privileges and immunities secured by the Constitution and by federal statute, in violation of 42 § U.S.C. § 1983. These actions were and continue to be condoned, adopted and fostered by COUNTY and VILLAGE policy makers, including but not limited to, Defendants MULVEY, SKRYNECKI and SMITH.

156.   Defendants intentionally and knowingly acted under color of law in an attempt to wrongfully, falsely and unlawfully charge and arrest CHARLES to further the personal vendettas of PETTUS and WING. These actions were carried out by the COUNTY Defendants on behalf, behest, and urging of the VILLAGE Defendants and in large part due to the culture of political favoritism and corruption that has plagued the COUNTY for decades.

157.   Defendants intentionally and knowingly acted under color of law in an attempt to wrongfully, falsely and unlawfully charge and arrest CHARLES. These actions were carried out by the COUNTY Defendants in large part due to the culture of police misconduct that has plagued the COUNTY for years, and is exemplified by recent discovery of the NCPD's failure to properly maintain, supervise and operate a crime laboratory.

158.   Defendants COUNTY and VILLAGE were aware of the systemic, widespread misconduct of its employees and the practice of its employees using or promising political favors to further their own interests, yet both the COUNTY and the VILLAGE acted

22

with deliberate indifference by: (a) failing to address remedy or change said systemic practices; (b) ignoring court orders and arbitrations rulings related to said infractions; (c) and by defending the pattern and practice of unlawful acts carried out in furtherance of police misconduct and political favoritism, both against CHARLES and on a wide scale level.

159.    Out of deliberate indifference and/or and unofficial custom and policy, defendants COUNTY and VILLAGE failed to adequately train or supervise their higher level supervisors, as to the Civil Rights laws and what constitutes a Civil Rights violation.

160.    As a direct and proximate result of said acts, omissions, indifference and custom and policy established by Defendants COUNTY and VILLAGE, and by policymakers/decisionmakers MULVEY, SKRYNECKI, SMITH, PETTUS and WING, CHARLES has suffered and continues to suffer diminished employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damages to his personal and professional reputation.

161.    As a result of Defendants COUNTY and VILLAGE's acts, CHARLES has suffered, and is entitled to damages sustained to date and continuing in excess of Five Million Dollars, including of punitive damages, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**42 U.S.C § 1983 – CONSPIRACY**

162.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 162, inclusive, as if fully set forth herein.

163.    At all times material to this Complaint, all named Defendants knowingly and willing entered into an agreement to violate CHARLES's civil and constitutional rights.

164.    In furtherance of the conspiracy, PETTUS and WING committed the overt act of tendering POWELL's false and fraudulent testimony to the COUNTY police officers, specifically YAO, DECARO and DORSI.

165.    YAO, DECARO and DORSI then performed the overt act of intentionally performing an improper and insufficient investigation into the baseless and fraudulent claims made by POWELL.

166.    Defendants' acts within this conspiracy also include the unlawful arrest of CHARLES and the unnecessary and unwarranted press conference held by SKRYNECKI.

167.    As a direct and proximate result of said conspiracy between the Defendants, CHARLES has suffered a violation of his civil rights under 42 U.S.C. § 1983 and violations of his rights provided pursuant to the First and Fourth Amendments to the United States Constitution.

168.    In addition, the acts of Defendants were so egregious and reprehensible and were performed in a manner which so violated the law and which were so outrageous that it constitutes conduct that no civilized society should be required to tolerate and, in addition to all damages suffered by CHARLES and in addition to all of the measures of relief to which CHARLES may properly be entitled to herein, Defendants should also be required to pay punitive damages to punish them for their reprehensible conduct and to deter them from such conduct in the future, and as an example to others similarly situated.

169.    Plaintiff therefore, pursuant to 42 U.S.C. § 1983, seeks compensatory damages in this cause of action for pain and suffering for the emotional harm inflicted upon CHARLES in the sum of Ten Million Dollars, including punitive damages, as well as attorney's fees and all other damages available under the statue upon which this action is predicated.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FALSE ARREST UNDER NEW YORK LAW

170.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 169, inclusive, as if fully set forth herein.

171.    As described above, the VILLAGE Defendants, along with POWELL, fabricated menacing and weapons possession charges against CHARLES, and used this information to improperly urge the COUNTY and its employees into arresting and arraigning CHARLES.

172.    These actions demonstrate that the VILLAGE, PETTUS, WING and POWELL played an active role in the arrest and prosecution of CHARLES, gave advice and encouragement to the NCPD, procured the arrest of CHARLES to be made, and through these actions showed active, officious and undue zeal.

173.    The COUNTY Defendants would have determined that CHARLES had not committed any crime had a proper, thorough and objective investigation been performed.

174.    The impetus for the arrest and arraignment of CHARLES were the false statements made by POWELL, the malicious motives of PETTUS and WING and the illegal and improper investigation into CHARLES by the COUNTY Defendants.

175.    The VILLAGE, PETTUS, WING and POWELL pushed this improper arrest and malicious prosecution in order to attempt to defame, discredit and punish CHARLES.

176.    Had the VILLAGE and/or WING conducted a proper, thorough and objective investigation it would (i) have determined that the evidence did not support a menacing, weapons possession or false imprisonment charge and (ii) not have turned the case over the to the NCPD.

25

177.    Had the COUNTY Defendants conducted a proper, thorough and objective investigation it would have determined that the evidence did not support a menacing, weapons possession or false imprisonment charge.

178.    Had the COUNTY Defendants conducted a proper, thorough and objective investigation it would have been clear that CHARLES was being improperly and unjustly targeted by members of the VILLAGE, including PETTUS and WING.

179.    PETTUS and WING, vindictively spearheaded this improper investigation and arrest of CHARLES, and used these investigations to attempt to eliminate CHARLES who they believed was a threat to their jobs.

180.    The investigations of CHARLES conducted by the COUNTY Defendants were performed with gross misconduct, bad faith and with no objectivity whatsoever.

181.    All Defendants were permitted to abuse their power, their positions within the COUNTY and the VILLAGE, and the policies and procedures of the COUNTY and VILLAGE to further their improper and illegal investigation and arrest of CHARLES.

182.    This misconduct was magnified by the COUNTY Defendants' neglect to: (a) properly investigate the matter; (b) focus on the totality of the evidence; (c) perform a thorough and objective investigation; (d) properly supervise the investigating officers; and (e) have proper policies and safeguards in place to prevent such gross misuse of power and authority.

183.    The COUNTY Defendants investigated POWELL's complaint against CHARLES.

184.    During the period of time between the initial interview of POWELL and the arrest of CHARLES, the COUNTY Defendants learned and acquired notice that no crime had been committed by CHARLES.

185.    Defendants YAO, DECARO and DORSI had neither probable cause nor reasonable belief that probable cause existed to arrest Plaintiff and seize Plaintiff's person.

186.    Without probable cause and without any legal right, Defendants YAO, DECARO and DORSI, while acting within the scope of their authority, intentionally, wrongfully, unlawfully and maliciously help CHARLES against his will while he was aware of the confinement for approximately 5 hours.

187.    Defendants YAO, DECAO and DORSI, in arresting and detaining CHARLES without probable cause, or reasonable belief that probable cause existed, abused their power and authority as employees of the County of Nassau and under color of state and/or local law.

188.    Upon information and belief, it was the deliberate choice, policy and custom of Defendants COUNTY, MULVEY, SKRYNECKI and SMITH to fail to adequately supervise and train their police officers, including YAO, DECARO and DORSI, in a manner to discourage unlawful arrests, causing YAO, DECARO and DORSI to arrest CHARLES without probable cause or a reasonable belief that probable cause existed.

189.    As a result of the above-described deliberate choices, policies and customs, police officers employed by Defendant COUNTY, including YAO, DECARO and DORSI, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

27

190.    The   above-described   deliberate   choices,   policies   and   customs demonstrated a deliberate indifference on the part of the policy makers of Defendant COUNTY to the constitutional rights of persons residing and doing business within the COUNTY, and were the cause of violations of CHARLES's rights alleged herein.

191.    By reason of their acts and omissions, Defendants YAO, DECARO and DORSI, acting under color of state law and within the scope of their authority, in gross and wanton disregard of CHARLES's rights, subjected CHARLES to an unreasonable seizure in violation of New York State Law.

192.    In addition, the acts of Defendants were so egregious and reprehensible and were performed in a manner which so violated the law and which were so outrageous that it constitutes conduct that no civilized society should be required to tolerate and, in addition to all damages suffered by CHARLES and in addition to all of the measures of relief to which CHARLES may properly be entitled to herein, Defendants should also be required to pay punitive damages to punish them for their reprehensible conduct and to deter them from such conduct in the future, and as an example to others similarly situated.

193.    CHARLES   therefore,   pursuant   to   New   York   State   Law,   seeks compensatory damages in this cause of action for pain and suffering for the emotional harm inflicted upon CHARLES in the sum of Five Million Dollars, including punitive damages, as well as attorney's fees and all other damages available under the statue upon which this action is predicated..

## AS AND FOR A SIXTH CAUSE OF ACTION
## DEFAMATION UNDER NEW YORK LAW

194.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 193, inclusive, as if fully set forth herein.

28

195.    In an intentional attempt to damage CHARLES, PETTUS, WING, POWELL and SKRYNECKI knowingly, willingly and maliciously published false statements to the residents of the VILLAGE, the residents of NASSAU and the news media regarding CHARLES.

196.    These false statements are that: (1) CHARLES is an armed vigilante who targets African-Americans; (2) CHARLES is a racist; and (3) CHARLES uses and firearms to threaten individuals.

197.    PETTUS, WING, POWELL and SKRYNECKI knew that these statements were false.

198.    PETTUS, WING, POWELL and SKRYNECKI intentionally made these statements for a malicious purpose – because PETTUS and WING believed that CHARLES was a threat to their jobs.

199.    Additionally, these statements were picked up by national news wires and appeared in newspapers, websites and news broadcasts across the country, including but not limited to NBC 4 New York, Newsday, The New York Post, and Gothamist.com.

200.    As a result of these defamatory statements CHARLES has suffered great damage to his personal and professional reputations.  Specifically, CHARLES's security and private investigation businesses lost clients who could not be, or did not want to be, affiliated with someone who was accused of these crimes and characteristics.

201.    As a result of these defamatory statements, CHARLES has suffered damages including emotional distress, loss of earnings and loss of business.

202.    In addition, the acts of Defendants were so egregious and reprehensible and were performed in a manner which so violated the law and which were so outrageous that it

29

constitutes conduct that no civilized society should be required to tolerate and, in addition to all damages suffered by CHARLES and in addition to all of the measures of relief to which CHARLES may properly be entitled to herein, Defendants should also be required to pay punitive damages to punish them for their reprehensible conduct and to deter them from such conduct in the future, and as an example to others similarly situated.

203.    CHARLES therefore, seeks compensatory damages in this cause of action for damage to his personal and professional reputations, and pain and suffering for the emotional harm inflicted upon CHARLES in the sum of Five Million Dollars, including punitive damages, as well as attorney's fees and all other damages available under the statue upon which this action is predicated.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## ABUSE OF PROCESS UNDER NEW YORK LAW

204.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 203, inclusive, as if fully set forth herein.

205.    As set forth above, Defendants PETTUS, WING and POWELL employed the use of a police complaint, which is regularly issued legal process, to compel the arrest of CHARLES.

206.    As set forth above, Defendants PETTUS, WING and POWELL used such process with intent to do harm to CHARLES, and neither PETTUS, WING nor POWELL had no excuse or justification for their actions.

207.    As set forth above, Defendants PETTUS, WING and POWELL commenced a criminal action against CHARLES in order to obtain a collateral objective that is outside the legitimate ends of the filing of the police complaint – intentionally harming and punishing CHARLES because PETTUS and WING viewed CHARLES as a threat to their jobs.

208.    In addition, the acts of Defendants were so egregious and reprehensible and were performed in a manner which so violated the law and which were so outrageous that it constitutes conduct that no civilized society should be required to tolerate and, in addition to all damages suffered by CHARLES and in addition to all of the measures of relief to which CHARLES may properly be entitled to herein, Defendants should also be required to pay punitive damages to punish them for their reprehensible conduct and to deter them from such conduct in the future, and as an example to others similarly situated.

209.    CHARLES therefore, seeks compensatory damages in this cause of action for pain and suffering for the emotional harm inflicted upon CHARLES in the sum of Five Million Dollars, including punitive damages, as well as attorney's fees and all other damages available under the statue upon which this action is predicated.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## INFLICTION OF EMOTIONAL DISTRESS UNDER NEW YORK LAW

210.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 209, inclusive, as if fully set forth herein

211.    As set forth above, Defendants intentionally engaged in extreme and outrageous conduct toward CHARLES, including, but not limited to, falsifying statements to support criminal charges, harassing and berating CHARLES, threatening prosecution for fraudulent charges; and threatening CHARLES's emotional well-being.

212.    As a result of Defendants' extreme and outrageous conduct, CHARLES has suffered severe emotional distress for which they are entitled to monetary and punitive damages.

213.    In addition, the acts of Defendants were so egregious and reprehensible and were performed in a manner which so violated the law and which were so outrageous that it

constitutes conduct that no civilized society should be required to tolerate and, in addition to all damages suffered by CHARLES and in addition to all of the measures of relief to which CHARLES may properly be entitled to herein, Defendants should also be required to pay punitive damages to punish them for their reprehensible conduct and to deter them from such conduct in the future, and as an example to others similarly situated.

214.   CHARLES therefore, seeks compensatory damages in this cause of action for pain and suffering for the emotional harm inflicted upon CHARLES in the sum of Five Million Dollars, including punitive damages, as well as attorney's fees and all other damages available under the statue upon which this action is predicated.

<u>JURY DEMAND</u>

215.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury of all issues so triable.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     On the First Cause of Action in the sum of Five Million Dollars;

B.     On the Second Cause of Action in the sum of Five Million Dollars;

C.     On the Third Cause of Action in the sum of Five Million Dollars;

D.     On the Fourth Cause of Action in the sum of Ten Million Dollars;

E.     On the Fifth Cause of Action in the sum of Five Million Dollars;

F.     On the Sixth Cause of Action in the sum of Five Million Dollars;

G.     On the Seventh Cause of Action in the sum of Five Million Dollars;

H.     On the Eighth Cause of Action in the sum of Five Million Dollars;

I.     An award of costs of this action including attorney's fees to the Plaintiff pursuant to 42 U.S.C.§ 1988;

J.    An award for such other and further relief as this Court may deem

appropriate.

Dated: New York, New York
       June 06, 2011


LASASSO GRIESMEYER LAW GROUP PLLC
Attorneys for Plaintiff
80 Maiden Lane, Suite 2205
New York, New York 10038
(212) 421-6000



By: _____
      Joseph Anci (JA 1813)

33

## VERIFICATION

STATE OF NEW YORK          )
                          )ss.:
COUNTY OF NEW YORK         )

**MICHAEL CHARLES**, being duly sworn, deposes and says:

I am the Plaintiff in the within proceeding.   I have reviewed the foregoing

Verified Complaint and know its contents thereof, which are true to my own knowledge; except

as to matters therein stated to be alleged on information and belief, and as to those matters, I

believe them to be true.

**MICHAEL CHARLES**

Sworn to before me this
__6__ day of June, 2011

Notary Public

**MARIEL LASASSO**
**NOTARY PUBLIC - STATE OF NEW YORK**
**NO. 02LA6195323**
**QUALIFIED IN NEW YORK COUNTY**
**COMMISSION EXPIRES OCTOBER 20, 2012**